UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 10-12133-RWZ

KEVIN HENSLEY

v.

GARY RODEN, SUPERINTENDENT,
MASSACHUSETTS CORRECTIONAL INSTITUTE NORFOLK

MEMORANDUM OF DECISION

January 2, 2013

ZOBEL, D.J.

Petitioner Kevin Hensley was tried and convicted in Massachusetts Superior Court of the first degree murder of his wife, Nancy Hensley. The Supreme Judicial Court of Massachusetts ("SJC") affirmed the conviction as well as the denial of petitioner's motion for a new trial. He now petitions for a writ of habeas corpus under 28 U.S.C. § 2254, contending that the SJC unreasonably applied federal law in holding that (1) opinion testimony on the victim's cause of death from a medical expert – who neither conducted the autopsy nor drafted the autopsy report – was admissible; (2) admission of the same medical expert's testimony regarding specific findings in the autopsy report was harmless error; and (3) trial counsel did not render ineffective assistance in failing to introduce documentary and expert evidence in support of a mental impairment defense. For the reasons discussed below, the petition is denied.

**I. Background**

The following facts are derived from the SJC opinion, Commonwealth v.

Hensley, 913 N.E.2d 339 (Mass. 2009), and the record:

Petitioner and his wife, Nancy Hensley ("Nancy"), were married in 1979 and had four children. By January 2002, the Hensleys were experiencing martial problems. The couple argued about whether Nancy was spending enough time at home and whether she was spending too much time at a local gym, possibly in the company of other men. On one occasion, petitioner disguised himself in a fake beard and watched his wife while she was at the gym. Upon seeing Nancy speaking with other men there, petitioner confronted her about her behavior.

Shortly thereafter, on January 9, 2002, Nancy obtained a temporary abuse prevention order against petitioner and filed a complaint for divorce in the Suffolk Probate and Family Court. The abuse prevention order required petitioner to stay away from the family's home at 198 Byron Street in East Boston and gave Nancy custody of the children pending a further hearing. Petitioner moved out of the house and began living at his sister's home in Winthrop.

At a hearing on January 16, 2002, the couple entered into an agreement which was made part of a temporary order in the divorce proceeding. Petitioner agreed that except for visitation exchanges with the children, he would remain away from the marital home. Petitioner and Nancy agreed that she would have use of the family's 2000 Buick LeSabre automobile, while he would use their other vehicle, a 1988 Plymouth Horizon. They also agreed that Nancy would continue to have custody of their four children, but that petitioner could have reasonable visitation if arranged twenty-four hours in advance.

During the weeks that followed, petitioner's family members, friends, and supervisor at work noticed that he appeared increasingly depressed and distraught about the breakup of his marriage, especially the loss of custody of his children. He separately confided to two close friends that if he did not get custody of his children, he would kill his wife and then kill himself.

On January 22, 2002, Nancy filed a complaint for contempt in the Probate and Family Court alleging that petitioner was not complying with their January 16 agreement. Four days later, at approximately 9:30 p.m., a neighbor observed petitioner jumping over a fence that surrounded an empty lot opposite 198 Byron Street. The neighbor informed Nancy about the incident. On the night before his wife's death, petitioner told a friend that he had been "trying to see his kids," and that "[h]e was over by the house and Nancy saw him and she was going down to take another restraining order out on him."

On January 31, petitioner reported to his job with the Boston Transportation Department's "tow and hold" unit at 6:30 a.m. At approximately 8 a.m., petitioner told his supervisor that he was not "feeling right" and asked to use some vacation time and go home. He drove first to his sister's home and then to 198 Byron Street, parking his Plymouth around the corner, out of view from the house. Petitioner was next seen by a neighbor leaving the house at about 11:45 a.m. in the family's Buick LeSabre.

Later that afternoon, petitioner's eldest daughter arrived home from school and discovered her mother Nancy lying under a comforter on the floor in the basement bathroom. She telephoned 911, and police and emergency medical personnel arrived

at the scene. Nancy was found dead with a blue necktie tied tightly around her neck. She had blood on her hands and face, and her left eye was swollen. She was wearing one sock, and a matching sock was found on the kitchen floor with what appeared to be a bloodstain.

That evening, petitioner was found in the Buick LeSabre in a parking lot at the Waterville Valley Ski Area in New Hampshire. He had tried to asphyxiate himself by running a dryer vent hose from the exhaust pipe into the vehicle. New Hampshire police officers and emergency personnel discovered petitioner, pulled him out of the vehicle, and transported him to the hospital, where he was held on an involuntary emergency hospitalization due to his suicide attempt. New Hampshire police learned that petitioner was a suspect in a homicide in Boston and, at the request of the Boston Police Department, interviewed him at the hospital regarding his activities that day. He acknowledged leaving work and going to 198 Byron Street but claimed he could not remember whether he went into the house or saw his wife. Early the next morning, an emergency warrant was issued in Boston for petitioner's arrest. He was taken into custody and transported to the Grafton County jail.

Dr. William Kane, a medical examiner for the Commonwealth, conducted an autopsy of Nancy's body on February 1, 2002. He identified external injuries around the neck and face that were consistent with strangulation by ligature, in this case a necktie. He also noted bruising in other areas of Nancy's body which suggested that there was a struggle prior to her death.

Petitioner was indicted and tried for murder in the first degree under the

alternative theories of deliberate premeditation and extreme atrocity or cruelty.  His defense was one of mental impairment, focused primarily on persuading the jury that he was incapable of forming the mental states required for murder in the first degree under either theory.  Trial counsel elicited testimony from witnesses, both on direct and cross-examination, highlighting the deterioration of petitioner's mental condition following the abuse prevention order.  Petitioner's friends and family testified that he cried constantly, appeared very depressed and lethargic, was at times incoherent and "out of it," and repeatedly expressed that he no longer wanted to live – a stark change from the quiet, mild-mannered family man they knew him to be.  Petitioner's daughter noted that he had stopped taking prescription medication for depression and, in the weeks leading up to Nancy's murder, resembled someone who was having a nervous breakdown, often shaking and crying uncontrollably.  Counsel chose, however, not to introduce expert testimony from a forensic psychiatrist and medical records regarding petitioner's mental health treatment.

Dr. Zane was scheduled to testify at the trial, but was unavailable on the date of his expected testimony.  In his place and over petitioner's objection, the Commonwealth called Dr. Mark Flomenbaum, the chief medical examiner and Dr. Zane's supervisor. After reviewing his education, experience, and qualifications in the field of forensic pathology, Dr. Flomenbaum explained the autopsy process generally, including the examination of the body and organs, the documentation of that process in a report, and the issuance of an opinion as to why and how a person died.

Dr. Flomenbaum then testified that he had reviewed Dr. Zane's autopsy report

and supporting materials, including Dr. Zane's notes and photographs of Nancy Hensley's body. Based on these materials, Dr. Flomenbaum opined that the cause of death was "ligature strangulation," the "mechanism" being not so much "loss of air" as "blood starvation to the brain." He also testified to many of the specific findings made by Dr. Zane in the autopsy report and to various conclusions regarding the length and nature of the struggle between petitioner and Nancy leading to her death. The autopsy report itself was not offered into evidence, and Dr. Flomenbaum confirmed on cross-examination that he had no involvement whatsoever in performing the autopsy or generating the report.

Defense counsel stressed in closing argument that petitioner could not have formed the mental states necessary for murder in the first degree, and the jury was given a mental impairment instruction, but to no avail. On July 14, 2002, petitioner was found guilty of first degree murder on both theories of deliberate premeditation and extreme atrocity or cruelty.

Petitioner filed an appeal with the SJC. He also filed, in the Superior Court, a motion for a new trial, alleging ineffective assistance of counsel. The motion was denied and appealed. The SJC consolidated the two appeals and, on September 15, 2009, affirmed both petitioner's conviction for murder and the order denying his motion for a new trial.

## II. Legal Standard

This court reviews petitioner's conviction under the highly deferential standard set forth in the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"): the

application for a writ of habeas corpus will not be granted unless the state court adjudication of his constitutional claims resulted in a decision that was "contrary to, or involved an unreasonable application of, clearly established" federal law, as determined by the Supreme Court. 28 U.S.C. § 2254(d)(1). A state court decision is contrary to clearly established Supreme Court precedent if it applies a rule that contradicts the law set forth by the Court or confronts a set of facts materially indistinguishable from a decision of the Court but reaches a different result, and it is an unreasonable application if the precedent is applied to the facts in an objectively unreasonable manner. Brown v. Payton, 544 U.S. 133, 141 (2005). An erroneous or incorrect application is not necessarily an unreasonable one, Williams v. Taylor, 529 U.S. 362, 411 (2000), and "if it is a close question whether the state decision is in error, then the state decision cannot be an unreasonable application," McCambridge v. Hall, 303 F.3d 24, 36 (1st Cir. 2002).

### III. Discussion

#### A. Confrontation Clause Claims

Petitioner argues that his Sixth Amendment right of confrontation was violated when the Superior Court, over his objection, allowed Dr. Flomenbaum to express opinions regarding the cause of death and testify to factual findings in Nancy Hensley's autopsy report even though he did not conduct or attend the autopsy. The SJC found that there was no error in admitting the opinion testimony of Dr. Flomenbaum because he "opined as an expert on the basis of information on which experts ordinarily and may properly rely, and was subject to cross examination." Hensley, 913 N.E.2d at 348. As

for the expert's disclosure of specific findings in the report, the SJC acknowledged that "such testimony may not have been admissible at that point in the trial . . . [but] any such error was harmless where the cause of death was not a contested issue at trial." Id. at 348-49.  The court also concluded that Dr. Flomenbaum's testimony bore solely on the Commonwealth's burden of proving first degree murder under the theory of extreme atrocity cruelty, and had no bearing on the issue of petitioner's murder conviction on the theory of premeditation.  Because the jury found petitioner guilty on both theories, and there was more than sufficient evidence to support the conviction of premeditated murder, the SJC saw no need to consider the effect of any possible error in admitting the doctor's testimony.  Id. at 349; see also id. n.9 ("'The Commonwealth need prove only one theory of murder in the first degree.  If a jury returns a guilty verdict based on two theories, the verdict will remain undisturbed even if only one theory is sustained on appeal.'") (quoting Commonwealth v. Nolin, 859 N.E.2d 843, 855 (Mass. 2007)).[1]

As a necessary predicate to his claims, petitioner asserts that the autopsy report is testimonial hearsay forbidden by Crawford v. Washington, which held that the Confrontation Clause bars the admission of testimonial evidence unless the declarant is unavailable and the defendant had a "prior opportunity for cross-examination." 541 U.S. 36, 68 (2004).  The Court expressly declined to define what constituted

---

[1] Petitioner asserts that the SJC's holdings on the admissibility of Dr. Flomenbaum's testimony were based not on Sixth Amendment considerations, but only on Massachusetts evidence law.  He is incorrect.  The SJC specifically cited to Crawford v. Washington, 541 U.S. 36 (2004), and a prior state case dealing with the federal Confrontation Clause right in its discussion of petitioner's claims.

"testimonial" hearsay, id. at 68 ("We leave for another day any effort to spell out a comprehensive definition of 'testimonial.'"), but noted that "business records" have historically been treated as "statements that by their nature are not testimonial," id. at 56.  The First Circuit, post-Crawford, found that autopsy reports were not testimonial and were admissible under the business record hearsay exception.  United States v. De La Cruz, 514 F.3d 121, 133 (1st Cir. 2008), cert. denied, 129 S. Ct. 2858 (2009).

Notwithstanding De La Cruz, petitioner maintains that autopsy reports are testimonial under Melendez-Diaz v. Massachusetts, 129 S. Ct. 2527, 2536 n.5 (2009). Melendez-Diaz held that certain affidavits reporting the results of forensic analysis were "testimonial" and the analysts had to be available for examination and confrontation.  That decision, however, says nothing about whether autopsy reports are testimonial statements,[2] and in fact, courts have been divided over the question even in the wake of Melendez-Diaz and progeny.[3]   For its own part, the First Circuit

---

[2] The footnote cited by petitioner does mention "autopsies," but simply as an example of a forensic analysis that cannot be repeated. It is also worth noting that Melendez-Diaz reiterated that "[b]usiness and public records are generally admissible absent confrontation not because they qualify under an exception to the hearsay rules, but because – having been created for the administration of an entity's affairs and not for the purpose of establishing or proving some fact at trial – they are not testimonial."  129 S. Ct. at 2539-40.

[3] Compare, e.g., Banmah v. State, 87 So.3d 101, 103 (Fla. Dist. Ct. App. 2012) (autopsy reports are non-testimonial because they are prepared pursuant to statutory duty and not solely for use in prosecution), People v. Cortez, 402 Ill. App. 3d 468, 474 (Ill. App. Ct. 2010) (Melendez-Diaz did not upset prior holdings that autopsy reports are non-testimonial business records that do not implicate Crawford), and People v. Dungo, 286 P.3d 442, 450 (Cal. App. 4th Dist. 2012) ("The autopsy continued to serve several purposes, only one of which was criminal investigation," and "[t]he autopsy report itself was simply an official explanation of an unusual death, and such official records are ordinarily not testimonial."), with Commonwealth v. Avila, 912 N.E.2d 1014, 1029 (Mass. 2009) (autopsy report was testimonial hearsay), Cuesta-Rodriguez v. State, 241 P.3d 214, 228 (Okla. Crim. App. 2010) (same), and Wood v. Texas, 299 S.W.3d 200, 209-10 (Tex. Crim. App. 2009) (not all autopsy reports are categorically testimonial, but where the police suspected the death at issue was a homicide, the autopsy report was testimonial).  See also Cato v. Prelesnik, 2012 WL 2952183 at *3 (W.D. Mich. July 18, 20012) (rejecting confrontation clause claim in habeas petition because "Crawford did not clearly establish that autopsy results are testimonial in nature" and "even under Melendez-Diaz this conclusion is uncertain.").

9

acknowledged the uncertainty created by Melendez-Diaz and the Supreme Court's subsequent decision in Bullcoming v. New Mexico, 131 S. Ct. 2705 (2011),[4] as well as their potential effect on the De La Cruz decision. Nardi v. Pepe, 662 F.3d 107, 111-12 (1st Cir. 2011). Nonetheless, at least in the habeas context, the First Circuit concluded that neither Crawford nor the later cases "clearly established" that autopsy reports are barred as testimonial. Id. ("Abstractly, an autopsy report can be distinguished from, or assimilated to, the sworn documents in Melendez-Diaz and Bullcoming, and it is uncertain how the [Supreme] Court would resolve the question. . . . And, even now it is uncertain whether, under its primary purpose test, the Supreme Court would classify autopsy reports as testimonial."). The First Circuit also found that even if autopsy reports could be classified as testimonial, it is not clear that in-court expert opinion testimony in reliance on such reports would be inadmissible. Id. at 112.[5]

To be sure, the SJC has held in other cases that the contents of an autopsy

---

[4] Petitioner also relies on Bullcoming, which held that laboratory reports of blood alcohol tests were testimonial, to support his view that an autopsy report is a testimonial document. But Bullcoming, was issued well after the SJC ruled on his case and is not pertinent to the current analysis. See Greene v. Fisher, 132 S. Ct. 38, 43-44 (2011); Likely v. Ruane, 642 F.3d 99, 101-102 (1st Cir. 2011).

[5] Following Nardi and after the parties filed their briefs in this case, the Supreme Court held in Williams v. Illinois, 132 S. Ct. 610 (2012), that the defendant's Confrontation Clause rights were not violated when an expert witness testified to an opinion based on a DNA report done by a non-testifying analyst because the report at issue was not testimonial. But Williams was a highly fractured decision in which five Justices expressly rejected the plurality's analysis in its entirety, and no line of reasoning garnered a majority. Far from clearing up the picture, the case has created more confusion and uncertainty regarding which forensic evidence is considered testimonial and which witnesses may or must testify. See, e.g., Jessica Smith, Confrontation Clause Update: *Williams v. Illinois* and What It Means for Forensic Reports, Administration of Justice Bulletin, No. 2012/03 (Sept. 2012), School of Government, The University of North Carolina, http://sogpubs.unc.edu/electronicversions/pdfs/aojb1203.pdf; Jeffrey Fisher, The holdings and implications of *Williams v. Illinois*, SCOTUSBLOG (Jun. 20, 2102, 2:20 PM), http://www.scotusblog.com/2012/06/the-holdings-and-implications-of-williams-v-illinois/. While Williams post-dates the SJC decision here, it serves to highlight the continuing unsettled nature of the law in this area.

report are testimonial hearsay, see Commonwealth v. Nardi, 893 N.E.2d 1221, 1232-33 (Mass. 2008), and appears to have operated on that presumption below. Even so, in this court, the First Circuit's holding controls. Because the admission of Dr. Flomenbaum's testimony, both with respect to his opinion and to specific findings in the autopsy report, did not violate clearly established Supreme Court precedent at the time of the SJC's decision, habeas relief is not warranted on petitioner's Confrontation Clause claims.

Even if the admission of Dr. Flomenbaum's testimony were constitutional error, petitioner has not established that it "had a substantial and injurious effect or influence in determining the jury's verdict" such that he is entitled to habeas relief. Brecht v. Abrahamson, 507 U.S. 619, 623 (1993). As the SJC correctly noted, the cause of death was not disputed at trial and Dr. Flomenbaum's testimony pertained solely to first degree murder on the theory of extreme atrocity or cruelty – not the theory of deliberate premeditation, for which the only issue was whether petitioner's mental health was so impaired that he lacked the capacity to premeditate the murder. A thin connection to the latter was drawn only in passing by defense counsel during closing argument. In light of all the other evidence pointing to petitioner's guilt based on deliberate premeditation, any error in permitting Dr. Flomenbaum to testify was harmless.

**B. Ineffective Assistance of Counsel**

Petitioner alleges that trial counsel provided ineffective assistance in violation of his Sixth Amendment rights in failing to introduce expert and documentary evidence of his mental impairment and its effect on his capacity to form the states of mind required

11

for first degree murder.  Specifically, petitioner faults counsel for (1) not calling Dr. David Rosmarin, a retained forensic psychiatrist who would have testified as to petitioner's version of the events and opined that he lacked the ability to deliberately premeditate or appreciate the nature of his atrocious or cruel acts; and (2) not presenting medical records of petitioner's mental illness and treatment.  Petitioner claims that the withheld evidence was crucial to explain his state of mind and contradict the prosecution's theory of the incident.

The SJC evaluated petitioner's ineffective assistance claim for "substantial likelihood of a miscarriage of justice" under Mass. Gen. Laws ch. 278, § 33E, a standard more favorable to petitioner than the federal constitutional one articulated in Strickland v. Washington, 466 U.S. 668 (1984).  See Knight v. Spencer, 447 F.3d 6, 10 (1st Cir. 2006); Commonwealth v. Wright, 584 N.E.2d 621, 624 (Mass. 1992).  The SJC held that trial counsel's decision not to call Dr. Rosmarin was strategic and could not be characterized as "manifestly unreasonable."  Hensley, 913 N.E.2d at 353; see Commonwealth v. Coonan, 705 N.E.2d 599, 603 (Mass. 1999) ("An attorney's tactical decision amounts to ineffective assistance only if it was manifestly unreasonable when made.") (citation omitted).  Trial counsel "thoroughly investigated and proceeded with a defense of mental impairment" and had engaged Dr. Rosmarin to testify at trial.  Id.  But, the SJC observed, the introduction of such testimony would have permitted the Commonwealth to present a rebuttal witness and may have divulged damaging evidence, including Dr. Rosmarin's conclusion that petitioner "did not lack criminal responsibility for the killing" and statements made by petitioner that would only have

bolstered the Commonwealth's theory that he acted out of anger and with deliberate premeditation.[6]  Id.  The SJC likewise found no applicable error in counsel's decision not to present petitioner's medical records since those documents, while showing that he had some history of anxiety and depression, would also have revealed a number of unsympathetic facts: that petitioner was greatly concerned his depression medication was impairing his sexual performance, refused further counseling on occasion, showed no symptoms of depression during two separate visits, and did not exhibit evidence of thought disorder, delusions, or hallucinations shortly following his suicide attempt.  Id. at 354.  In light of the testimony already elicited from family and friends regarding petitioner's mental and emotional condition, and the fact that the jury was ultimately given a mental impairment instruction, the SJC concluded that counsel was not ineffective in declining to introduce additional evidence that may have undermined his trial strategy.  Id.

Petitioner contends that the SJC's decision was an unreasonable application of Strickland.[7]  Under Strickland, a defendant must first show that "counsel's representation fell below an objective standard of reasonableness," a highly deferential analysis in which the court "must indulge a strong presumption that counsel's conduct

---

[6] The SJC, by way of example, notes that petitioner related to Dr. Rosmarin that "I was going to tell [the victim] how angry I was that I had to kill myself. . . . I was afraid I might beat her up. . . . I grabbed her. . . . I started choking her.  Saying, 'You destroyed me and my family.'  I just choked her. . . . I was going to take my life and I blamed her for it."  Hensley, 913 N.E.2d at 353-54.  See also id. n.12 (summarizing petitioner's version of the killing as described in an expert report by Dr. Rosmarin).

[7] Because the SJC applied a standard of review more favorable than that required by Strickland, its decision was not "contrary to" Supreme Court precedent.  Knight, 447 F.3d at 15.  Furthermore, if the state ineffective counsel standard is met, then the federal standard is also met.  See Commonwelath v. Mello, 649 N.E.2d 1106, 118 & n.16 (Mass. 1995); McCambridge, 303 F.3d at 35.

falls within the wide range of reasonable professional assistance." 466 U.S. at 688-89. If there is unreasonable error, a defendant must also establish prejudice, "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694.  On habeas review, the question is not simply whether counsel's actions were reasonable per Strickland, but whether the SJC's decision that petitioner's ineffective assistance claim lacked merit was a reasonable application of Strickland under § 2254.  Harrington v. Richter, 131 S. Ct. at 785; see id. at 788 ("The standards created by Strickland and § 2254(d) are both 'highly deferential,' and when the two apply in tandem, review is 'doubly' so.") (citations omitted).

      Here, the SJC's decision was an eminently reasonable application of Strickland which instructs that "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." 466 U.S. at 690.  As the SJC noted, "this is not a case in which trial counsel failed to investigate the possibility of a mental impairment defense." Hensley, 913 N.E.2d at 353.  To the contrary, counsel conducted appropriate investigation, obtained medical records, and retained Dr. Rosmarin to evaluate petitioner and provide expert testimony.  Although counsel initially intended to introduce the medical records and call Dr. Rosmarin at trial, the record shows that he (correctly) concluded that, given all the evidence already presented, the court would provide a mental impairment instruction even without the additional evidence.  By choosing to rely instead on the more sympathetic testimony of petitioner's family and friends – who not only described his severe depression but also

recounted his great love for and devotion to his children – counsel avoided the risk of exposing the jury to potentially damaging information from Dr. Rosmarin and the medical records. Moreover, counsel argued forcefully in summation for a verdict of second degree murder, reminding the jury that they had heard "compelling evidence of mental impairment. . . . [which] affects the state of mind, the intent" required for murder in the first degree. In view of the circumstances, it cannot be said that counsel's tactical choice here "was so patently unreasonable that no competent attorney could have made it." Knight, 447 F.3d at 6. The SJC reasonably determined that trial counsel's performance did not amount to ineffective assistance.[8]

**IV. Conclusion**

The petition for a writ of habeas corpus is DENIED.


    January 2, 2013                                 /s/Rya W. Zobel
        DATE                                          RYA W. ZOBEL
                                                          UNITED STATES DISTRICT JUDGE

---

[8] Because trial counsel's representation was not deficient, there is no need to evaluate petitioner's claim under the prejudice prong of the Strickland analysis. Knight, 447 F.3d at 15.